O

# United States District Court
# Central District of California

TIGI LINEA CORP et al.,

           Plaintiffs,

    v.

COOL FREAKIN GENIUS LLC,

           Defendant.

Case № 2:25-cv-10761-ODW (ASx)

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION [15]**

## I.    INTRODUCTION

Plaintiffs TIGI LINEA CORP., TIGI HOLDINGS LTD., and ELIDA BEAUTY US (IP) LLC, (together, "TIGI"), bring this trade dress infringement action against Defendant COOL FREAKIN' GENIUS LLC ("CFG").  (Compl., Dkt. No. 1.)  TIGI now moves for a preliminary injunction, asking the Court to enjoin CFG's use of allegedly infringing packaging on its haircare products.  (Mot. Prelim. Inj. ("Motion" or "Mot.") 6, Dkt. No. 15.)  On January 6, 2026, the Court heard oral argument from TIGI and CFG.  (Mins., Dkt. No. 35.)  For the reasons discussed below, the Court **GRANTS** the Motion.

## II.    BACKGROUND

### A.    BED HEAD

TIGI owns the haircare brand BED HEAD, which was co-founded in 1996 by Bruno Mascolo, his brothers, and his wife Kyara Mascolo. (Mot. 6.) BED HEAD-branded products consist of shampoos, conditioners, and styling products such as mousses, sprays, and creams. (Compl. ¶ 27.) Although originally developed for exclusive use in salons, BED HEAD products are directly available to consumers through in-store and online retailers. (*Id.* ¶ 62.)

The BED HEAD brand is extremely successful: since 2013, TIGI has sold 124 million units of BED HEAD-branded products for over $611 million in revenue. (*Id.* ¶ 59.) BED HEAD has also garnered a significant following amongst celebrities and other content creators, and has featured in many leading fashion and beauty publications. (*See id.* ¶¶ 67, 72–78.)

### B.    Claimed Trade Dress

TIGI claims trade dress protection in its entire line of BED HEAD products. (Mot. 8–9.) BED HEAD's product line's trade dress is composed of the following elements: (1) an array of bottles that feature "many vibrant fluorescent colors across the color spectrum"; (2) "each bottle has a single, solid color, and each cap/actuator has a single, solid color, that is fluorescent or metallic and that sharply contrasts with the bottle color"; (3) "several different bottle shapes that feature fanciful, symmetrical, 360-degree curves; (4) "a two-word, two-line, irreverent primary trademark typically on the upper half of the bottle and typically in a black or white typeface"; and (5) "an irreverent and provocative product name in all capital letters featured prominently at or just below the middle of the bottle in a solid color" (the "BH Trade Dress"). (*Id.*) TIGI claims these current products bear the BH Trade Dress:



(Decl. Mark Bleathman ISO Mot. ("Bleathman Decl.") ¶ 24, Dkt. No. 16.)

TIGI also claims trade dress protection in two specific products: (1) SMALL TALK, a thickening cream; and (2) QUEEN FOR A DAY, a thickening spray. (Mot. 10–11.)

The SMALL TALK trade dress is composed of the following elements: (1) "spherical, (2) light purple bottle with (3) a yellow pump with visible spiral threading," (4) "prominently displays the two-word, two-line, bold, irreverent, primary trademark," and (5) an irreverent and provocative product name featured prominently in all capital, sans-serif letters in a two-line display ("ST Trade Dress"). (*Id.* at 10.)



The QUEEN FOR A DAY trade dress is composed of the following elements: (1) "a metallic, fluorescent light purple bottle color"; (2) "a contrasting, fluorescent yellow cap/actuator"; (3) "a 360-degree, rounded indent within the top third of the bottle"; (4) "a two-word, two-line, bold irreverent, primary trademark centered on the bottle, at or just above the bottle's midline";

(5) "an irreverent and provocative product name in all capital, sans-serif letters featured prominently in a two-line display on the lower half of the bottle"; and (6) "a product name that features 'Queen' as the most prominent term within the product name" ("QFD Trade Dress") (together, with the BH and ST Trade Dresses, "TIGI Trade Dresses").  (*Id.* at 11.)

## C.    COOL FREAKIN' GENIUS

In 2009, after non-party Unilever purchased TIGI and the BED HEAD brand from the Mascolo family, Bruno and Kyara Mascolo signed a ten-year non-compete agreement.  (Decl. Kyara Mascolo ISO Opp'n ("K. Mascolo Decl.") ¶ 13, Dkt. No. 25-5.)  In 2015, Kyara Mascolo founded CFG and began selling cosmetics.  (*Id.* ¶ 14.)  In 2023, after Kyara Mascolo's non-compete agreement expired, CFG began developing haircare products.  (*Id.* ¶ 15.)

In July 2025, CFG launched its FREAKIN' GENIUS haircare brand at a beauty product trade show.  (Bleathman Decl. ¶ 77.)  FREAKIN' GENIUS products include the following:



(*Id.* ¶ 78.)

CFG sells FREAKIN' GENIUS products directly to salons.  (K. Mascolo Decl. ¶ 38.)  It also sells FREAKIN' GENIUS products directly to consumers on its website,

coolfreakingenius.com, and through Amazon's online marketplace. (Decl. Leo Kittay ISO Mot. ("Kittay Decl.") ¶ 9, Dkt. No. 17; Suppl. Decl. Leo Kittay ISO Reply. ("Suppl. Kittay Decl.") ¶ 2, Dkt. No. 29.) The price of FREAKIN' GENIUS products ranges from $30.00 to $59.00, (Kittay Decl. ¶ 9), while the price of TIGI's SMALL TALK and QUEEN FOR A DAY products starts at $23.50, (*id.* ¶ 10).

In late July 2025, TIGI learned of the FREAKIN' GENIUS products. (Bleathman Decl. ¶ 77.) On November 4, 2025, TIGI sent CFG a cease-and-desist letter. (Kittay Decl. ¶ 12.) The parties were unable to resolve their differences, and in November 2025, TIGI filed this infringement lawsuit against CFG and filed the instant Motion. (*Id.*; Compl; Mot.)

### III.    LEGAL STANDARD

A court may grant preliminary injunctive relief to prevent "immediate and irreparable injury." Fed. R. Civ. P. 65(b). To obtain this relief, the plaintiff must establish: (1) a likelihood of success on the merits; (2) a likelihood that he will suffer irreparable harm if the preliminary relief is not granted; (3) that the balance of equities tips in his favor; and 4) that the injunction is in the public interest (the "*Winter* factors"). *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The burden of demonstrating the need for a preliminary injunction rests with the moving party. *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994). The moving party must meet this burden with a "clear showing" that the preliminary injunction is warranted. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 881 (9th Cir. 2003).

### IV.    DISCUSSION

The *Winter* factors support granting a preliminary injunction here.

**A.      Likelihood of Success on the Merits**

TIGI is likely to succeed on the merits of its trade dress infringement claim. Trade dress "is the appearance of the product and may include features such as size, shape, color, color combinations, texture, or graphics." *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1506 (9th Cir. 1987).  To succeed on a trade dress infringement claim, a plaintiff must prove that its claimed dress is (1) nonfunctional and (2) distinctive, and (3) that defendant's product creates a likelihood of consumer confusion.  *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001).

*1.      Functionality*

Trade dress must be nonfunctional to be protected.  *TrafFix Devices v. Mktg. Displays, Inc.*, 532 U.S. 23, 29–30 (2001).  "A product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation related disadvantage." *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998) (citation modified).  In the Ninth Circuit, courts determining functionality of a product consider several factors: (1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." *Id.*   "Functional elements that are separately unprotectable can be protected together as part of a trade dress." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 842 (9th Cir. 1987).

Here, TIGI will likely establish that the TIGI Trade Dresses are nonfunctional. The TIGI Trade Dress definitions include aesthetic elements which, when viewed together, do not "yield[] a utilitarian advantage." *Disc Golf*, 158 F.3d at 1006.  Each TIGI Trade Dress definition requires that the bottle head and the bottle itself must be contrasting colors, and that the colors themselves must be fluorescent or metallic.

(*See* Mot. 9–12.)    Moreover, each definition also requires the presence of a "two-word, two-line, irreverent, primary trademark" and an "irreverent and provocative product name in all capital letters." (*See id.*)    These elements serve a purely aesthetic purpose that does not yield a utilitarian advantage for TIGI or its consumers. *See Moroccanoil, Inc. v. Zotos Int'l, Inc.* ("*Moroccanoil II*"), 230 F. Supp. 3d 1161, 1171 (C.D. Cal. 2017) (finding that trade dress elements "comprised of specific colors, fonts and styles" "serve a purely aesthetic purpose" and are not functional).

CFG argues, among other things, that "bright colors and playful product names" are "key branding and marketing decisions," and that the "[b]right colors and contrasting caps aid in shelf visibility." (Opp'n 16, Dkt. No. 25.)    It also argues that the bottle shapes themselves are utilitarian, and thus, functional.    (*Id.*)    These arguments fail for two reasons.    First, CFG focuses on the functionality of independent elements without considering how the elements combine to create an "overall visual impression." *Clicks Billiards*, 251 F.3d at 1259.    Although individual elements can be "separately unprotectable," when combined, they can be "protected together as part of a trade dress." *Fuddruckers*, 826 F.2d at 842.    Even assuming that the bottle shape itself might be "separately unprotectable," *id.*, when combined with all the other elements of the TIGI Trade Dresses, the bottle becomes a protectable "overall visual impression," *Clicks Billiards*, 251 F.3d at 1259.    Second, CFG is essentially arguing that purely aesthetic decisions are also functional.    (Opp'n 16 ("[The bottles] are either utilitarian or aesthetic, not source-identifying.").)    The Ninth Circuit has rejected this theory, holding that trade dress "cannot be both functional and purely aesthetic." *See Clicks Billiards*, 251 F.3d at 1260 (citation modified) (noting also that the Ninth Circuit has not adopted the separate "notion that a purely aesthetic feature can be functional.")    Thus, while the purely aesthetic elements of the TIGI Trade Dresses may yield certain advantages to TIGI, those advantages are not, and cannot be, functional as a matter of law.

For these reasons, TIGI is likely to show that the TIGI Trade Dresses are nonfunctional.

### 2. Distinctiveness

"Distinctiveness requires the trade dress be 'capable of distinguishing the applicant's goods from the goods of others." *Moroccanoil II*, 230 F. Supp. 3d at 1172 (citation modified) (quoting *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 (9th Cir. 1998). Trade dress is distinctive "if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992).

Trade dress is inherently distinctive if its "intrinsic nature serves to identify a particular source." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000). The Supreme Court has recognized that when a business encases a product in a "distinctive packaging," it "is most often to identify the source of the product." *Id.* at 212. While product packaging can also serve "subsidiary functions," such as "invok[ing] positive connotations in the consumer's mind" or "attract[ing] an otherwise indifferent consumer's attention," packaging's "predominant function remains source identification." *Id*.

Here, the TIGI Trade Dresses are inherently distinctive because they serve to identify and set apart BED HEAD products. Each TIGI Trade Dress definition contains aesthetic elements. All three require bright, contrasting bottle and cap/actuator colors, and all three require "irreverent" product names or primary trademarks. (Mot. 8–11.) While each of these elements may have "subsidiary functions," such as making BED HEAD products stand out on a product shelf, their "predominant function remains" identifying a BED HEAD product. *Wal-Mart Stores*, 529 U.S. at 212. As Bruno Mascolo himself has acknowledged, the "vivid color" and "bottle shape" of BED HEAD products "differentiates [BED HEAD] from all others." (Kittay Decl. Ex. 13 ("TIGI Article") 3, Dkt. No. 17-2.)[1]

---

[1] When discussing the TIGI Article, the Court cites to the CM/ECF pagination.

For these reasons, TIGI is likely to show that the TIGI Trade Dresses are distinctive.[2]  Thus, the Court need not reach the question of whether the TIGI Trade Dresses have acquired secondary meaning.  *See Moroccanoil II*, 230 F. Supp. 3d at 1172.

### 3.    Likelihood of Confusion

The Ninth Circuit has set forth eight factors a court should consider in determining whether two marks are confusingly similar.  *Sleekcraft*, 599 F.2d at 348–49.  The *Sleekcraft* factors are: (1) strength of the mark, (2) proximity or relatedness of the goods, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) type of goods and the degree of care likely to be exercised by the purchasers, (7) defendant's intent in selecting the mark, and (8) likelihood of expansion of product lines.  *Id.*

A court need not address all eight factors, as "it is often possible to reach a conclusion . . . after considering only a subset of the factors."  *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999); *see Fortune Dynamic, Inc. v. Victoria Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030 (9th Cir. 2010) ("This eight-factor analysis is 'pliant,' illustrative rather than exhaustive, and best understood as simply providing helpful guideposts.").  Indeed, "[s]ome of the *Sleekcraft* factors will be more important in certain contexts than in others."  *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 986 (C.D. Cal. 2002).  The following seven factors support finding a likelihood of confusion.

### a.    Strength of the Marks

"The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is

---

[2] The Court notes that CFG fails to rebut inherent distinctiveness because it fails to address the issue in its opposition brief.  Instead, CFG dedicates its distinctiveness argument to secondary meaning, and even then, appears to conflate secondary meaning with the strength of mark factor under *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979), *abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003).  (*See generally* Opp'n.)

accorded by the trademark laws." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011). A mark's strength is measured in terms of its "conceptual strength" and "commercial strength." *JL Beverage Co., LLC, v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016) (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000)).

"A mark's conceptual strength depends largely on the obviousness of its connection to the good or service to which it refers." *Network Automation*, 638 F.3d at 1149 (quoting *Fortune Dynamic*, 618 F.3d at 1032–33). "Conceptual strength involves classification of a mark 'along a spectrum of generally increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful." *Id.* (quoting *Brookfield*, 174 F.3d at 1058. For the same reasons that the Court finds that the TIGI Trade Dresses are inherently distinctive, the Court also finds that the TIGI Trade Dresses are conceptually strong, ranking at least "arbitrary," if not "fanciful." They are certainly not lower on the distinctiveness spectrum, such as merely "descriptive" or "suggestive," as the combination of contrasting colors and two-word irreverent marks in no way "describes" or "suggests" haircare products. Thus, TIGI Trade Dresses are conceptually strong.

Commercial strength is based on "actual marketplace recognition." *Brookfield*, 174 F.3d at 1058. Here, TIGI gathers a plethora of evidence supporting actual marketplace recognition of BED HEAD products. In the past ten years, TIGI has sold 124 million units of BED HEAD-branded products, totaling $611 million in sales. (Bleathman Decl. ¶ 46.) BED HEAD products are also firmly established in the beauty sector: their sales put them amongst the top performing beauty products in the field, (*id.* ¶ 48), and celebrities and publications regularly feature BED HEAD products in advertising or promotions, (*id.* ¶¶ 55–72). Thus, the TIGI Trade Dresses are commercially strong.

For these reasons, the Court finds that the TIGI Trade Dresses are both conceptually and commercially strong, and that this factor weigh heavily for TIGI.

b.     Relatedness of Goods, Marketing Channels, and Degree of Care

The Court analyzes relatedness of goods, marketing channels, and degree of care together because the parties' arguments regarding these three factors are related.

If two goods are related, there is a higher likelihood that the "public will mistakenly assume there is an association between the producers of the related goods." *Sleekcraft*, 599 F.2d at 350.  The test for related goods or services is whether the two products "would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1212 (9th Cir. 2012) (*quoting Sleekcraft*, 599 F.2d at 348 n.10).  When both products are offered in the same general industry, they are related.  *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1127 (9th Cir. 2014).  "To determine whether goods are related, courts may consider whether the goods are complementary, whether the products are sold to the same class of purchasers, and whether the goods are similar in use and function." *Groupion, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1074 (N.D. Cal. 2012).

Use of convergent marketing channels increases the likelihood of confusion. *Sleekcraft*, 599 F.2d at 353.  Courts may consider "where the goods were sold, the price range of the goods, and types of advertising used." *Moroccanoil II*, 230 F. Supp. 3d at 1175.  Similar to relatedness of goods, courts may also consider "whether the parties' customer bases overlap." *Pom Wonderful*, 775 F.3d at 1130.

These two factors weigh heavily for TIGI.  Both BED HEAD and FREAKIN' GENIUS products are offered in the haircare and beauty field.  Both BED HEAD's and FREAKIN' GENIUS's product lines include shampoos, conditioners, and styling products.  (*See* Bleathman Decl. ¶ 92.)  It is undeniable that these products are extremely similar and "are offered in the same general industry." *Pom Wonderful*, 775 F.3d at 1127.

CFG offers two arguments in an attempt to lessen the impact of the relatedness and marketing channel factors.  First, CFG argues that it does not share the same

marketing channels and customers as TIGI.  (Opp'n 22–23.)  CFG states that, instead, it sells only to professional salons while TIGI sells its BED HEAD products through mass-market retailers.  (*Id.* at 22.)   However, TIGI submits considerable and persuasive evidence that CFG's assertion is untrue.  TIGI's evidence demonstrates that CFG also sells directly to consumers through its Amazon store and its own website.  (Kittay Decl. ¶ 9; Suppl. Kittay Decl. ¶ 2.)  Thus, the evidence shows that CFG and TIGI both sell directly to beauty-oriented consumers.

Second, CFG argues that any relatedness between goods is illusory because of the great degree of care that its consumers use when purchasing hair care products.  (Opp'n 23–25.)  "In analyzing the degree of care that a consumer might exercise in purchasing the parties' goods, the question is whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines."  *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 634 (9th Cir. 2005).  Courts have recognized that purchasers of beauty products "tend to exercise a high degree of care and brand consciousness."  *Glow Indus.*, 252 F. Supp. 2d at 1001.  However, the less expensive the products, the less likely a consumer will exercise great care.  *See Surfvivor Media*, 406 F.3d at 634.

Here, any "greater care" that beauty product consumers may exercise does not vitiate the extreme relatedness and overlapping marketing channels of BED HEAD and FREAKIN' GENIUS products.  CFG is correct that courts generally presume that beauty product purchasers tend to exercise a higher degree of care.  However, this presumption is weak in this case because the products at issue here range from around $23.50 to $59.00, with most products listed at $36.00 or less.  (Kittay Decl. ¶¶ 9–10.)  The presumption is also weak because, as TIGI proves, CFG does not sell just to the expert salon stylist but also to the average consumer.  (Kittay Decl. ¶ 9; Suppl. Kittay Decl. ¶ 2.)  Thus, the "fact that [the hair care products] are not expensive goods, coupled with the fact that the average purchasers are not experts, leads to the conclusion that the degree of care exercised by the purchasers will likely be low."

*Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.* ("*Moroccanoil I*"), 57 F. Supp. 3d 1203, 1220 (C.D. Cal. 2014).

For these reasons, the Court finds that the relatedness of goods and marketing channel factors weigh heavily for TIGI. The Court also finds that the degree of care factor does not neutralize the former two factors favoring TIGI. If anything, degree of care weighs slightly for TIGI.

        c.   <u>Similarity</u>

It is axiomatic that the more similar two products are, the greater the likelihood of confusion. *See Sleekcraft*, 599 F.2d at 350–51. "Three principles guide a court in determining whether marks are similar." *JL Beverage Co.*, 828 F.3d at 1109 (citing *Fortune Dynamic*, 618 F.3d at 1032). "First, similarity is best adjudged by appearance, sound, and meaning." *Id.* (internal quotation marks omitted). "Second, the marks must be considered in their entirety and as they appear in the marketplace." *Id.* "Third, similarities are weighed more heavily than differences." *Id.*

Here, FREAKIN' GENIUS products are undeniably similar to BED HEAD products bearing TIGI Trade Dresses. Below are examples of current BED HEAD products (on the left) compared to FREAKIN' GENIUS products (on the right):



| BED HEAD | FREAKIN' GENIUS |
|----------|-----------------|



(Bleathman Decl. ¶ 92.)[3]

Below are examples of past BED HEAD products (left) compared to FREAKIN' GENIUS products (right):

| BED HEAD | FREAKIN' GENIUS |
|---|---|

---

[3] During the January 6, 2026 hearing on the Motion, Defendant's counsel presented examples of certain FREAKIN' GENIUS products for the first time. Several products featured contrasting colors on the top and bottom halves of the bottle, with a color gradient in the center of the bottle transitioning from one color to the next. The TIGI Trade Dress definitions, which require that "each bottle ha[ve] a single, solid color," do not cover the products that Defendant's counsel presented. Thus, those products, and any similar products, are outside the scope of this injunction.



(*Id.* ¶ 93.)

The similarities above far outweigh the differences. Each FREAKIN' GENIUS product, like its BED HEAD counterpart, has contrasting bottle and cap/actuator colors. With the exception of the spherical, CURL GENIUS product, each product also has a bolded, two-word, irreverent house mark, and underneath it, a two-word, similarly irreverent product name. Moreover, each FREAKIN' GENIUS product matches, in almost identical contrasting colors, with a BED HEAD product. In particular, CFG's U.R. QUEEN product is especially similar to the QFD Trade Dress, considering both feature the word "queen" prominently in their product names. The inescapable conclusion is that the trade dresses here are extremely similar.

CFG asks the Court to compare the products "function-by-function," such as shampoo with shampoo or conditioner with conditioner. (Opp'n 18–22.) However, it provides no authority that requires such an analysis, nor does it provide evidence that BED HEAD and FREAKIN' GENIUS products "appear in the marketplace" divided by function. *JL Beverage Co.*, 828 F.3d at 1109. Rather, TIGI provides evidence that CFG has marketed its products grouped together, leaving consumers with the potential

impression that all the products are BED HEAD products.  (*See* Bleathman Decl. ¶¶ 105–06; Kittay Decl. Ex. 15 ("CFG Convention Photo"), Dkt. No. 17-4.)

CFG also argues that there is little similarity between the products because CFG and TIGI have distinct house marks (BED HEAD versus freakin' genius). (Opp'n 21.)  This argument is unpersuasive.  First, the house marks are so similar that it weakens CFG's argument.  Both are two-word, two-line, bold, and irreverent marks, such that the house marks may actually increase the potential for confusion.  Second, the color schemes and bottle shapes are so similar between the two product lines that the difference in house mark does not dilute the similarities.  *See JL Beverage Co.*, 828 F.3d at 1109 ("[S]imilarities are weighed more heavily than differences.").  Third, crediting this argument would lead to absurd consequences, allowing entities to infringe with impunity so long as they use a different house mark.  *See adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d at 758 n.5 ("[A] trademark may not be freely appropriated so long as the user also includes its own logo.").

For these reasons, the Court finds that the similarity factor weighs heavily for TIGI.

### d.  Actual Confusion

Evidence of "actual confusion among significant numbers of consumers provides strong support for the likelihood of confusion."  *Network Automation*, 638 F.3d at 1151.  "Survey evidence can [also] present evidence of actual confusion."  *Moroccanoil I*, 57 F. Supp. 3d at 1219.  Regardless of the strength of the evidence of actual confusion, "the failure to prove instances of actual confusion is not dispositive."  *JL Beverage Co.*, 838 F.3d at 1111 (citation modified).

Here, TIGI provides ample evidence of actual confusion.  First, TIGI includes declaration testimony that demonstrates confusion among consumers, industry professionals, and influencers.  At least two industry professionals thought that TIGI was operating CFG's booth at the July 2025 trade conference.  (Bleathman Decl. ¶ 108; Decl. MarKetha Rosborough ISO Mot. ¶ 18, Dkt. No. 19; Decl. Scott Sharpless

ISO Mot. ¶ 9, Dkt. No. 20.)   Influencers and consumers also confused FREAKIN'
GENIUS products with BED HEAD.   (Bleathman Decl. ¶¶ 104–07.)   Second, TIGI
also conducted a survey that revealed confusion levels ranging from 21.5% to 48.5%,
depending on the specific product.   (Decl. Hal Poret ISO Mot. Ex. 21 ("Poret
Report") 6, Dkt. No. 18-1.)

CFG argues and objects that TIGI's testimonial evidence is hearsay and should
be given little-to-no weight.   (Opp'n 25–27; Objs. 3–6, Dkt. No. 26.)   However, the
Court may "consider hearsay in deciding whether to issue a preliminary injunction."
*Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).   Moreover, TIGI's
testimonial evidence is not offered for the truth of the matter asserted, but rather for
the state of the mind of the declarant, that is, their confusion.   *See Conversive, Inc. v.
Conversagent, Inc.*, 433 F. Supp. 2d 1079, 1091–92 (C.D. Cal. 2002) (collecting cases
and finding that declaratory evidence of out-of-court statements regarding actual
confusion are not hearsay).

CFG also objects to the survey evidence on several grounds, including that
TIGI's survey "appears to target general online consumers, not salon purchasers."
(Opp'n 28–29.)   None of CFG's objections are persuasive, as they are all predicated
on the false assertion that FREAKIN' GENIUS products are sold only to and at
salons.   (*Id.*; *see* Kittay Decl. ¶ 9; Suppl. Kittay Decl. ¶ 2.)   Thus, that TIGI's survey
considered general consumers as well as salon purchasers is not a defect.

For these reasons, the Court finds that there is substantial evidence of actual
confusion, and that this factor weighs heavily for TIGI.

e.   Intent

"This factor favors the plaintiff where the alleged infringer adopted his mark
with knowledge, actual or constructive, that it was another's trademark."   *Brookfield*,
174 F.3d at 1059.   However, this "factor is only relevant to the extent that it bears
upon the likelihood that consumers will be confused by the alleged infringer's mark
(or to the extent that a court wishes to consider it as an equitable consideration)."   *Id.*

This factor is particularly relevant here because the Mascolos founded the BED HEAD brand. They, by their own admissions, recognized the importance of the aesthetic principles at the core of the TIGI Trade Dresses. When they owned BED HEAD, Bruno Mascolo acknowledged that the "vivid color" and "bottle shape" of BED HEAD products "differentiates [BED HEAD] from all others," (TIGI Article 3), while Kyara Mascolo admitted that "[w]omen already thought of BED HEAD as being fun and cool, so we were easily able to slip into the same marketing strategy of using unusual shapes and names" (*id.* at ) It is simply uncredible for them to claim that they created strikingly similar products with no actual or constructive intent to adopt those same aesthetic principles. Thus, this factor weighs in favor of TIGI.

In sum, because the TIGI Trade Dresses are nonfunctional and distinctive, and because TIGI has shown likelihood of confusion, the Court finds that TIGI is likely to succeed on the merits for its trade dress infringement claims.

**B.    Irreparable Harm**

On December 27, 2020, Congress codified the rule that a plaintiff seeking a preliminary injunction to enjoin trademark infringement "shall be entitled to a rebuttable presumption of irreparable harm upon a finding of . . . likelihood of success on the merits." 15 U.S.C. § 1116. The statute is clear. Thus, having established a likelihood of success on the merits, TIGI is entitled to a presumption of irreparable harm.

CFG's arguments all presume that TIGI did not establish likelihood of success on the merits. (Opp'n 32–33.) Instead of offering evidence to rebut this presumption, CFG argues that TIGI fails to demonstrate likelihood of irreparable harm. (*Id.*) This is improper burden shifting.

Thus, the Court finds that TIGI is likely to suffer irreparable harm absent preliminary injunctive relief.

**C.    Balance of Equities**

Courts must weigh "the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987). While the Court recognizes that CFG potentially faces, as CFG claims, some degree of hardship, "including the loss of inventory, distributor relationships, and the livelihood of 12 employees and contractors," (Opp'n 34), these are the "results [of] [CFG's] allegedly infringing conduct," *2Die4Kourt v. Hillair Cap. Mgmt., LLC*, 692 F. App'x 366, 369 (9th Cir. 2017). Moreover, the Court doubts that the livelihoods of CFG employees and contractors would be so direly affected considering that CFG existed successfully for nearly a decade before it very recently debuted FREAKIN' GENIUS. (*See* K. Mascolo Decl. ¶¶ 14–15.) Furthermore, "[TIGI] will likely suffer irreparable reputational injury" from CFG's continued infringement "for which [TIGI] cannot be adequately compensated with money damages." *Moroccanoil II*, 230 F. Supp. 3d at 1178. Thus, the Court finds that the balance of equities tips in favor of TIGI.

**D.    Public Interest**

Lastly, the public has an "interest in protecting trademarks." *Brookfield*, 174 F.3d at 1066. Essentially, this factor almost always favors the trade dress owner. CFG's arguments presume that there is no "reliable evidence of confusion," (Opp'n 34), but as the Court has discussed, it has "serious questions as to whether consumers will likely be confused between the products," *Moroccanoil II*, 230 F. Supp. 3d at 1178. Thus, the Court finds that the public interest weighs in favor of granting a preliminary injunction.

Accordingly, on balance, all four *Winter* factors support granting a preliminary injunction. Further, because CFG does not ask for a security bond pursuant to Federal Rule of Civil Procedure 65(c), the Court waives a security bond for purposes of this preliminary injunction. *See Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir.

1999) (recognizing that courts granting a preliminary injunction have discretion "as to the amount of security required, if any").

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

## V.    CONCLUSION

For the reasons discussed above, the Court **GRANTS** TIGI's Motion for a Preliminary Injunction.    (Dkt. No. 15.)    The Court **ENJOINS** CFG from the following:

- Using the following product packaging, or any packaging design that is confusingly similar to the following product packaging:



- Using any product packaging that incorporates the BH Trade Dress, the QFD Trade Dress, or the ST Trade Dress in their entirety, or any packaging design that is confusingly similar to one or more of these trade dresses; and

- Instructing, assisting, aiding, or abetting any other person or business entity in engaging in or performing the above activities, or taking any action that contributes to any of the above activities.

**IT IS SO ORDERED.**

January 12, 2026

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**